FILED

SEP 2 9 2017

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
AKRON

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| KAREN C. HAN,<br><br>Plaintiff,<br><br>v.<br><br>HANKOOK TIRE CO., LTD., a South Korean Corporation,<br><br>Defendant. | Case No. **5:17 CV 2046**<br><br>**COMPLAINT**<br><br>**JUDGE LIOI**<br>**MAG. JUDGE LIMBERT**<br><br>**(JURY TRIAL DEMANDED)** |

Plaintiff Karen C. Han ("Plaintiff" or "Han"), through her counsel, as and for her Complaint against Defendant Hankook Tire Co., Ltd., a South Korean Corporation, ("Defendant" or "Hankook"), states and alleges as follows:

## NATURE OF THE ACTION

1.    This is a diversity action to seek a monetary judgment against Defendant, asserting breach of contract and fraud claims. In this action, Plaintiff seeks to recover damages resulting from an illegal financial scheme in which Plaintiff unknowingly participated at Defendant's instructions pursuant to the terms and conditions of the relevant contract into which Plaintiff was fraudulently induced by Defendant to enter. Plaintiff brings this action because Defendant refused to indemnify such damages incurred by Plaintiff as agreed by the parties in the contract described above.

2.    The present case marks Plaintiff's second litigation effort in this Court. Previously, in 2008, Plaintiff's first action against Defendant (the "First Action") was

dismissed without prejudice for lack of subject matter jurisdiction. Thereafter, a re-institution of Plaintiff's claims against Defendant has been delayed by a dispute between Plaintiff and the Financial Supervisory Service ("FSS"), a South Korean corporation without capital, over discovery of evidence exclusively within FSS's possession that is critical to both parties' positions in this case—whether the financial transactions at issue in this case were in violation of laws or regulations of South Korea such that the contractual indemnity obligation was triggered to indemnify Plaintiff by Defendant. Since 2005, FSS has refused to cooperate with discovery in the United States, claiming entitlement to foreign sovereign immunity. This immunity issue involving FSS was the subject of Plaintiff's litigation efforts for some ten (10) years; currently Plaintiff's declaratory judgment action against FSS (the "New York Action") is pending in the United States District Court for the Southern District of New York (the "SDNY"), bearing docket number 17-cv-04383-GBD-BCM, seeking a declaration, *inter alia*, that FSS is obligated to provide testimony or produce documents in its possession for Plaintiff to prove her case in this action.

3.      Plaintiff's breach of contract claim is timely re-instituted within Ohio's fifteen (15) year limitations period applicable to breach of contract in writing. The limitations period applicable to Plaintiff's fraud claim has run while Plaintiff has been disputing the immunity issue with FSS. However, as alleged in the New York Action, while Plaintiff has been pursuing her rights diligently, FSS, acting in concert with Defendant, has not only fraudulently concealed the discovery of Plaintiff's cause of action against Defendant, but has also unlawfully or improperly hampered proof of Plaintiff's case by refusing to provide evidence without any valid grounds. As such,

Plaintiff is entitled to invoke equitable tolling to save her fraud claim against Defendant.

## PARTIES AND RELEVANT NON-PARTIES

4.      Plaintiff Han is a citizen of the State of Texas. Han is pursuing this cause of action against Defendant individually and as the real party in interest for Peninsula Asset Management (Cayman) Ltd. ("Peninsula"), which is now defunct.

5.      Defendant Hankook is a global corporate conglomerate organized and existing under the laws of South Korea, with its principal offices located in Seoul, South Korea. Non-party Yang-Rae Cho ("Mr. Cho"), a citizen of South Korea, is, at all times material hereto, the Chairman of the Board and controlling shareholder of Hankook (currently the Chairman of the Board of Hankook Tire Worldwide Co., Ltd., a holding company of Hankook). Hankook and Mr. Cho were named as defendants in the First Litigation. No relief is sought herein against Mr. Cho because upon information and belief, this Court has no personal jurisdiction over Mr. Cho. Mr. Cho is included in this Complaint primarily to present factual allegations.

6.      Non-party FSS is a civil special corporation without capital established under the laws of South Korea, with its principal offices located in Seoul, South Korea, which maintains a branch office in New York, NY.

7.      Non-party No Joon Park ("Park") is the spouse of Han, residing in the State of Texas with Han. Park was an additional plaintiff principally related to a fraud-related claim in the First Action. Park seeks no relief against Defendant in this action because his claim for damages is largely duplicative of Plaintiff's. He is included in this Complaint primarily to present factual allegations.

3

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over this matter and the parties pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds $75,000.00 exclusive of costs.

9.      This Court has personal jurisdiction over Defendant because Defendant has continuously maintained a business establishment in the State of Ohio—at 3535 Forest Lake Drive, Uniontown, Ohio 44685—since 1991, thereby subjecting itself to the jurisdiction of this Court.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this judicial district.

## FACTUAL ALLEGATIONS

11.     Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

### Hankook's Illegal Financial Activities in Offshore Tax Haven Area

12.     The events and transactions that gave rise to Plaintiff's claims in this action concern Hankook's illegal financial activities in an offshore tax haven area in the 1990's. Han, Park and Peninsula were fraudulently induced by Hankook to perform certain services to implement an illegal scheme involving money laundering and insider stock trading for the benefit of its controlling shareholder, Mr. Cho.

13.     In December 1995, Han (the sole shareholder of Peninsula) founded Peninsula to engage in the business of the provision of financial services to world-renowned investment banks in international finance centers. Cho Hung Bank group in

4

South Korea (merged into Shinhan Bank in 2006) sponsored the establishment of Peninsula with a view to acquiring the expertise and client network of Park (initial director of Peninsula) in the global equity derivatives market by providing Peninsula with various forms of assistance, such as supplying office space in Seoul, South Korea, to Peninsula and placing its investment funds in the amount of $20 million under Peninsula's management.

14.    Peninsula specialized and quickly became known as one of the market leaders in the provision of financial services related to structured investments using novel derivatives financial engineering, and Peninsula's clients included industry leaders such as Credit Suisse First Boston, Union Bank of Switzerland, Robert Fleming/Jardine Fleming, ING Barings, Lehman Brothers, Credit Lyonnais and others.

15.    In late 1998, Peninsula was approached and retained by Hankook to act as the agent for Ocean Capital Investment (L) Limited ("Ocean"), an investment fund established by Hankook in Labuan, Malaysia, an offshore tax haven area, to raise $28 million in the international market. Hankook advised Peninsula that it was under significant time constraints to raise the funding as part of a refinancing for Hankook's other investment companies formed in Labuan, Malaysia. Hankook also represented to Peninsula that the operations of such offshore investment funds were legitimate business activities of the company. Relying on Hankook's credit and representations, Peninsula fulfilled its contractual duties in accordance with the terms and conditions of the relevant agreements executed between Hankook and Peninsula through Ocean. In addition, Hankook also requested that Peninsula, Park and Han act as Ocean's agents for general purposes because Ocean had no personnel, and from time to time

Park and Han performed such agent's role as requested by Hankook.

16.    Pursuant to the agreements with Peninsula, representatives of Hankook directed Peninsula to place $20,000,000 of Zero Coupon Notes due 2003 (the "Ocean Notes") with the Korea Long Term Credit Bank (the "KLTCB") on December 23, 1998, and to also transfer the proceeds to Ocean's United States Dollar account in New York, NY. Peninsula, and Park and Han, as employees or agents of Peninsula, executed these transactions as explicitly instructed by Hankook.

17.    Prior to the transactions described above, Hankook employees represented to Peninsula that the KLTCB was the purchaser of the notes. This representation was false. Unbeknownst to Peninsula at that material point in time, the Ocean Notes were actually acquired by subsidiaries and affiliates of Hankook through a designated cash trust account, that is, a nominee account, maintained at the KLTCB, in violation of laws and regulations of South Korea governing offshore securities and foreign currency transactions.

18.    Under the Regulations on the Foreign Exchange Management of South Korea (Provision 10-53-5) then effective, South Korean residents who were not eligible institutional investors were allowed to purchase foreign currency-denominated securities only through accounts opened at securities companies in South Korea, which in turn, must report the details of the transactions to authorities. As is the case in the United States, the main objective of this regulation, which must be strictly observed by South Korean residents, is for South Korean authorities to screen for fraudulent overseas transfers of foreign currency disguised as overseas investments.

19.    Peninsula, doing business in the international finance market, had a

legal obligation to abide by the applicable selling restrictions imposed by each country's laws and regulations. For example, under applicable laws and regulations of South Korea, Peninsula was not allowed to directly or indirectly offer, sell or deliver any notes in South Korea or to any resident in South Korea, or to others for re-offering or re-sale directly or indirectly in South Korea or to any resident of South Korea, except to eligible investors such as the KLTCB. Due to Hankook's calculated misrepresentations intended to induce Peninsula to enter into certain agreements to provide their services, Peninsula inadvertently violated South Korea's selling restrictions. Hankook used Peninsula to perpetrate a money laundering scheme by which Hankook could obtain its goal: the transfer of $20 million in United States Dollars from South Korea—Hankook's governing jurisdiction—to an overseas account in New York, NY ("NYC Account"). Once effectively laundered into the NYC Account, the funds could be freely transferred.

20. In connection with the placement of the Ocean Notes, Peninsula agreed to provide and were paid only for services relating to documentation, administration and settlement of the transactions. Peninsula was not paid for, nor did it provide or agree to provide, any underwriting or sales services on a success basis in connection with the transactions. As such, Peninsula was deceived and used only for the purpose of putting up "a good front" for Hankook by lending its good name and goodwill to the matter, so that Hankook could consummate its fraudulent offshore transactions. Peninsula, Park, and Han had no reason to believe that the transactions were illegal and they reasonably relied on representations made by Hankook during the negotiations that ultimately resulted in their agreement to provide financial

services, as well as the representations and warranties in the relevant contracts and other key documents.

21.    In early 2001, serious scandals involving secret offshore funds started to become widely publicized in South Korea. Rumors began to circulate in South Korea and in Hong Kong, where most of Peninsula's clients were regionally headquartered, that Peninsula had been implicated in serious stock manipulation schemes implemented by illegal offshore funds, and Han, Park and Peninsula's business began to suffer as a result of the rumors.

22.    Finally, it was drawn to Peninsula's attention that the offshore fund for which it acted as an agent on behalf of Hankook, the Ocean fund, had been kept off Hankook's accounting books and record—which means that the Ocean fund was a slush fund (for the benefit of Mr. Cho), and, even more alarming, that the transactions Peninsula, Park and Han performed were actually the process of illegal transfer of foreign currency from South Korea to overseas. Under applicable South Korean laws and regulations at the time, participation in these unlawful acts would subject any parties involved to heavy criminal penalties in that jurisdiction. For example, under Korean Act No. 06746, if the amount involved in the illegal acts exceeds the equivalent of approximately $4 million, then the principal is subject to a minimum of ten (10) years imprisonment and could receive up to a life sentence.

23.    In November of 2001, as a final warning, the Ministry of Finance and Economy of South Korea ("MOFAE") ordered all South Korean corporations and residents to report any offshore funds under their effective control to the Bank of Korea, and provided a three-month grace period. Supervisory agencies also pressed

for voluntary reports and announced their intent to conduct thorough on-the-spot probes after the expiration of the grace period in February of 2002.

24.     Due to these events, Peninsula, Park, and Han became concerned about the fact that the transactional records underlying Hankook's unlawful handling of United States Dollars and its illegal offshore fund of Hankook were nearly all in their names, and thus they could be seen as a principal of, or a party to, the illegal transactions.  Accordingly, Peninsula repeatedly attempted to contact Hankook to urge the company to issue a voluntary report regarding the transactions. However, the Hankook employee who had worked with Peninsula in connection with the transactions intentionally avoided Peninsula's repeated telephone messages for three days in a row.

25.     In March 2002, having ascertained that neither Hankook nor Mr. Cho made a voluntary report as required by relevant South Korean laws and regulations, Peninsula was compelled to retain counsel based in Hong Kong which sent a demand letter to Hankook for remedies under the indemnity provisions of Peninsula's relevant contract with Hankook through Ocean (the "Indemnity Clause"). The Indemnity Clause provided that the indemnity obligations would be triggered when "any breach or alleged breach of the laws or regulations of Malaysia, Korea and United States of America" resulted from the transactions Peninsula or its agents performed for Hankook in relation to the Ocean transactions. The indemnity obligations included the indemnification for "all losses, liabilities, costs, charges and expenses (including legal fees and expenses) which [Peninsula and its agents] may suffer or incur…" The

Indemnity Clause also provided in relevant part, that "each [Placing Agents Persons including Plaintiff] shall have an independent right of action…" A correct copy of the Placing Agreement containing the Indemnity Clause signed by a representative of Hankook and Han is attached hereto as **Exhibit A**.

26.     Subsequent to the receipt of the demand letter by Hankook, Park had several meetings with representatives of Hankook. In one of such meetings held in May 2002, Park met with Dong Woo Seo ("Seo"), counsel for Hankook, Jong Chul Lee (Chief Financial Officer of Hankook and the person in charge of the secret overseas operations) ("Lee"), and Chang Gyu Moon (a former employee of Hankook) ("Moon"). During the meeting, Lee and Moon confessed to Seo that the overseas paper company held illegal funds on flight overseas and was connected to Mr. Cho personally. The meeting adjourned without any firm conclusion, but Peninsula believed that Seo would advise and persuade Mr. Cho to make a voluntary report about the offshore transactions.

27.     About ten (10) days after the May 2002 meeting with Seo, Park held another meeting with Lee at his office in the Hankook Tire Building in Seoul, South Korea. During this meeting, Lee suddenly changed his previous position and completely denied any breach of laws or regulations by Hankook, and instead attempted to blame and shift all responsibility for the acts of money laundering onto Peninsula and other experts that had been consulted by Hankook. Indeed, during the meeting, Lee flatly rejected Peninsula's sincere and reasonable request for a written stipulation that Hankook did not inform Peninsula that the offshore fund's notes were

to be placed with subsidiaries and affiliates of Hankook (in violation of the governing laws and regulations of South Korea). In or around July 2002, Hankook offered through Bae, Kim & Lee, a South Korean law firm representing Hankook, approximately $500,000 for indemnification to Peninsula's South Korean legal counsel, Young-Ki Kwon. However, facing the threat of potential criminal prosecution, Han and Park decided to discontinue Peninsula's business.

28.     In or around August 2002, Hankook made a false report to FSS, a civil corporation which operates as a "buffer" between South Korean financial institutions and South Korea's governmental agency (equivalent to United States' SEC). Hankook stated in the report that the offshore operations were for the benefit of Hankook, rather than for Mr. Cho personally. However, until that time, the overseas slush funds had been kept off the balance books of Hankook.

29.     As a result of the false report to FSS, on December 24, 2002 the Securities and Futures Commission of South Korea ("SFC") ordered Hankook to reflect the offshore slush funds on its financial statements, and also levied administrative sanctions on Hankook and on Mr. Cho individually, finding that Hankook's offshore financial activities at issue were in violation of various laws and regulations of South Korea.

**Additional Background Facts Leading up to the Ocean Transactions**

30.     In or around August 1996, Hankook caused the formation of three investment funds in Labuan, Malaysia: Jade Investment (L) Limited ("Jade"), Jahama

Investment (L) Limited ("Jahama"), and Ocean.

31.    Hankook formed Jade and Jahama to operate as investment vehicles through which Mr. Cho could trade in shares of stock in Hankook, and formed Ocean to operate as a holding company for any profits realized from the investments by Mr. Cho through Jade and Jahama.

32.    In or around October 1996, Jade and Jahama raised funding of $41 million by issuing debt instruments backed by Hankook's credit without following all required internal and external procedures, an act which was prohibited under South Korean laws and regulations. Jade and Jahama used these funds to purchase 13.1% of the total outstanding shares of Hankook stock. Also, simultaneously, Mr. Cho and Jade/Jahama entered into financial option transactions in side-letter agreements; the effect of the side agreements was that all gains or losses from the investments in shares of Hankook by Jade and Jahama shall belong to Mr. Cho—a fact that was unknown to Peninsula at the material time, and which was also in violation of South Korean laws and regulations.

33.    Due to the financial crisis which hit South Korea in late 1997, in late 1998 the share price of Hankook had dropped to the level of below half of the initial purchase price of October 1996. The fallen share price caused a potentially serious financial problem for Jade and Jahama and ultimately, Mr. Cho and Hankook because it meant that they would not have sufficient funds for repayment of the $41 million in debt coming due in or around October 1999. As a result, Mr. Cho and Hankook were in a desperate, time-sensitive position—they needed to quickly acquire and send

United States Dollars in a substantial amount to an overseas account without being detected by South Korean authorities.

34.     As set forth above, as a result of the promises and representations made by Hankook, Peninsula, relying on such representations, entered into the Placing Agreement effective as of October 11, 1998, for the placement of notes issued by Ocean. Accordingly, as directed by Hankook, Peninsula, Park, and Han subsequently provided services in connection with transactions to transfer $20 million to the NYC Account on December 23, 1998.

### Hankook's Stock Price Manipulation Scheme

35.     For Jade and Jahama, and ultimately Mr. Cho, to make a profit after repaying debt and interest at maturity in or around October 1999, the share price of Hankook had to rise substantially within a very short time period.

36.     Although Mr. Cho was required to report to South Korean authorities on the mass holding of Hankook shares by Jade and Jahama, he failed to do so. As prescribed in the relevant provisions of the Securities and Exchange Act of South Korea (Article 200-2, Report on Mass Holding, etc. of Stocks) then effective:

> …any person (excluding those who are prescribed by Presidential Decree) who holds voting stocks of a stock-listed corporation or Association-registered corporation in large quantities shall report the situation of their holdings to the Financial Supervisory Commission and the Stock Exchange.

As further provided by the securities and exchange act described-above, the language

regarding "large quantities" refers to cases where the number of voting shares owned by the person himself and all specially-connected persons, in the aggregate, amounts to more than 5% of all outstanding shares of voting stock. Thus, Mr. Cho's violation was a fraudulent act against the public at large which was kept in the dark, including existing and potential investors all over the world.

37.  In or around February 1999, in an apparent attempt to boost Hankook's share price for the benefit of Mr. Cho, Hankook purchased 2.98% of Hankook's total outstanding shares as treasury stock.

38.  Similarly, in or around April 1999, in another apparent attempt to artificially boost Hankook's share price for the benefit of Mr. Cho, Hankook's board of directors passed a resolution effecting a stock split characterized as a 100% "bonus" stock to all those who would be Hankook shareholders of record as of May 24, 1999. This unprecedented action caused the price for Hankook shares to spike to unparalleled levels. A correct copy of the stock price graph, along with trading volume with respect to the movement of share price of Hankook during the relevant period of time, is attached hereto as **Exhibit B**.

39.  In May 1999, as an apparent result of the board of director's publicly disclosed decision to issue "bonus" stock, and the directors' other undisclosed decisions to manipulate Hankook's stock, Hankook's share price on the open market rose to its historically highest price. Hankook took advantage of the short-lived spike in price to dispose of the Hankook shares held by Jade and Jahama, which Plaintiff alleges resulted in a net gain of approximately $25,000,000 on the original 1996

transactions that was immediately transferred by Jade and Jahama to Ocean, and to other offshore entities under Hankook's control.

40.     Hankook's quarterly financial report for the third quarter of the 2003 accounting year lists the following three investment funds or entities in European tax haven areas as its major shareholders: Eastern Investment S.A., Snowdon-Mast B.V. and EL 2 S.A. A correct copy of the relevant portion of Hankook's quarterly financial report for the third quarter of 2003 that contains the information described above is attached hereto as **Exhibit C**. As shown in **Exhibit C**, each of the three shareholders held 4.9% of Hankook's total outstanding stock, which obviously purported to avoid the 5% reporting requirement (as addressed in paragraph 36). Upon information and belief, these three entities in tax haven areas are "other offshore entities under Hankook's control" referenced in paragraph 39 above.

41.     In January 2007, SFC requested FSS to investigate the three offshore entities holding Hankook stock described above. At the request of Eun Soo Ha ("Ha") of FSS, who was in charge of said investigation, Park cooperated with him in the investigation. However, in February 2007, Ha notified Park that the Governor (referring to Jeung-Hyun Yoon ("Yoon"), then Governor of FSS and the Chairman of the Financial Supervisory Commission of South Korea ("FSC")) ordered him to cease the investigation.

42.     A number of major South Korean media outlets such as Shindonga, Hankyoreh, MBC and KBS covered or reported on Hankook's secret offshore funds described above. Most of the reporters involved in the news coverage suspected that

15

some high-level employees of FSS might have conspired with Hankook to cover up the severity of Hankook and Mr. Cho's unlawful acts, such as insider stock trading using offshore funds, or forming offshore slush funds that were subject to forfeiture by the government. They felt that under the circumstances, FSS was required to report those acts which apparently entailed such severe violations of laws to the Prosecutors' Office, FSC, or SFC.

### The First Action

43.     On or about September 10, 2002, counsel for Han and Peninsula, now retained in the United States, sent to Hankook, Mr. Cho and Ocean another demand letter requesting indemnification based upon the Indemnity Clause.

44.     On or about September 30, 2002, Hankook sent a response letter to counsel for Han and Peninsula, claiming that neither Hankook nor Mr. Cho breached any laws or regulations of South Korea in connection with the Ocean transactions. Han and Peninsula deemed this response to constitute a breach of the Indemnity Clause. Accordingly, on or about October 8, 2002, Han and Peninsula filed their complaint against Hankook, Mr. Cho and Ocean in the 153rd Judicial District Court of Tarrant County, Texas, claiming causes of action for breach of contract, fraud, negligent misrepresentation, civil conspiracy and piercing-corporate-veil. On May 14, 2004, this Texas state action was dismissed for lack of personal jurisdiction over defendants.

45.     Subsequently, on June 17, 2004, the First Action, bearing docket

number 04-cv-01153-DDD, was instituted by Han, Peninsula and Park against Hankook, Mr. Cho and Ocean, asserting the same claims as in the Texas state action.

46.     Because the First Action was essentially premised on the Indemnity Clause, the outcome of the action hinged upon the proof of breach of laws or regulations of South Korea in connection with the Ocean transactions. Contrary to plaintiffs' claim in the First Action, Hankook categorically denied that any relevant services or transactions at issue were in violation of any South Korean laws or regulations. Hankook further asserted that despite its full disclosure concerning the Ocean transactions to FSS, no allegations of impropriety or illegality was made by FSS against Hankook, Mr. Cho or Ocean. Accordingly, both parties' discovery focused on FSS's findings as to the legality of the Ocean transactions.

47.     As such, without obtaining discovery directly from FSS—the only independent person or entity within the jurisdiction of the United States that both parties could rely upon for proof of their claims or defenses—concerning breach of laws or regulations of South Korea in connection with the Ocean transactions, the First Action could not proceed further.

## The Contempt Proceeding in the SDNY

48.     In this connection, on March 22, 2005, the First Action plaintiffs served FSS at its New York branch office with a subpoena *duces tecum*, issued from the SDNY, demanding that FSS produce a witness with knowledge of FSS's investigation of Hankook as well as responsive documents.

49.    FSS did not dispute that it possessed documents and information that were responsive to the subpoena. Further, FSS did not lodge any written objections to the document requests within 14 days after the subpoena was served, as required by Fed.R.Civ.P. 45(c)(2)(B) then effective (currently Fed.R.Civ.P. 45(d)(2)(B)). On April 14, 2005, FSS filed with the SDNY a motion to quash the subpoena on several grounds, including that it was entitled to foreign sovereign immunity.

50.    After the deposition of a FSS manager in charge of the New York branch office on immunity-related issues and two hearings before the SDNY, the SDNY issued its June 15, 2005, Order, which denied the motion to quash and ordered FSS to proceed and cooperate in the discovery process. In this Order, the SDNY stated that: "The Second Circuit has held that while there is no specific test for 'organ,' status, the following factors are relevant to the determination: (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law. Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004)…" Applying the Filler test, the SDNY found that FSS only met the first factor with any certainty. Accordingly, the SDNY concluded that FSS was not a government organ of South Korea, and that FSS could not claim sovereign immunity.

51.    Although the First Action plaintiffs continued with their efforts to obtain the routine discovery from FSS, even repeatedly offering to make the process

as convenient as possible for FSS by taking depositions and examining documents at the FSS offices in Seoul, South Korea, rather than in New York, FSS continued to stubbornly defy and refused to even partially comply with the SDNY's discovery order. Accordingly, on or about August 25, 2005, the First Action plaintiffs filed a motion to hold FSS in contempt for refusing to comply with the discovery order. FSS responded that the confidentiality provisions of South Korea's Act on Establishment of Financial Supervisory Organizations of 1997 (the "Establishment Act") prohibited it from disclosing the requested information. The First Action plaintiffs countered that FSS was allowed to disclose the information under South Korea's Official Information Disclosure Act, South Korean equivalent of the Freedom of Information Act of the United States.

52.    On November 10, 2005, the SDNY entered a Memorandum and Order denying the motion for contempt. The SDNY first determined that Section 35(2) of the Establishment Act was a blanket confidentiality foreign statute that prevented FSS from complying with its discovery order. The SDNY then held that the relevant balancing test to determine whether to still compel FSS to comply with the order weighed in favor of non-compliance with its order.

53.    In making its decision not to hold FSS in contempt, the SDNY heavily relied on two letters from the Embassy of South Korea at Washington D.C. (the "South Korean Embassy"): one sent to Department of State of the United States (the "Embassy Diplomatic Letter"), dated September 14, 2005, a correct copy of which is attached hereto as **Exhibit D**, and the other to the SDNY, dated October 5, 2005, a

correct copy of which is attached hereto as **Exhibit E**. The Embassy Diplomatic Letter states in pertinent part that "[i]t is feared that any contempt of court against FSS may bring about some undesirable effect upon the relations between the government of the United States and the government of Republic of Korea."

54. Having been taken by surprise by the abrupt about-face involvement of the South Korean Embassy because Park was previously officially notified by the Ministry of Foreign Affairs and Trade of South Korea ("MOFAT") and FSC that they could not involve themselves in a civil matter affecting the decision of U.S. courts (correct copies of which notification letters immediately followed by English translations are attached collectively hereto as **Exhibit F**), the First Action plaintiffs promptly drew the attention of the SDNY two days prior to and during the contempt hearing to the possibility that the note of diplomatic protest as designated by FSS's counsel, was issued without proper authority. The Embassy Diplomatic Letter or the note of alleged diplomatic protest on its face, clearly indicated lack of proper authority: there was an indication that the formality and content was so coarse as to doubt whether the letter or note was validly issued in due procedure—in fact the letter was not signed and did not contain the name of the author of the letter. Without hearing from Department of State of the United States, the SDNY impulsively concluded that the letter at issue constituted the stated position of the South Korean government.

55. Immediately after the SDNY issued its Order denying the motion to hold FSS in contempt, the Foreign Relations and Trade Committee of the South Korean National Assembly undertook an investigation into whether the Embassy

Diplomatic Letter was issued with proper authorization in accordance with the provisions of the Act on the Appointment and Powers of the Government Delegates and Special Envoys of South Korea, and concluded that it was not, finding that Yoon, then the Governor of FSS and the Chairman of FSC, asked non-MOFAT officials at the South Korean Embassy who were delegated from MOFAE to issue the letter, even without the Minister of MOFAT or the Ambassador to the United States being aware of the issuance of the letter, let alone approving the letter as required by the provisions of the act referenced above. Upon information and belief, Yoon's unauthorized act described-above was the result of his discussion with Woong Bae Na—who was the former Minister of MOFAE, Yoon's former superior, and the former president of Hankook—at the request of Mr. Cho.

56.    The First Action plaintiffs appealed from the SDNY's Order denying their motion for contempt. FSS cross-appealed from the June 15, 2005, Order, denying its motion to quash subpoena based on foreign sovereign immunity. On January 30, 2007, the Second Circuit Court affirmed the SDNY's denial of the contempt motion on other grounds, rendering the cross-appeal moot—on the grounds of foreign sovereign immunity, finding with support in the record, that is, the two letters from the South Korean Embassy referenced in paragraph 53 above, that: "As an agency or instrumentality of a foreign state under the FSIA, FSS is immune from the present subpoena." Peninsula Asset Management (Cayman) Ltd. v. Hankook Tire Co., 476 F.3d 140, 144 (2d Cir. 2007). Thus, the Second Circuit Court, in fact, reversed the SDNY's finding, applying the Filler test, that FSS was not a government organ of

South Korea, relying on the two letters from the South Korean Embassy that were not before the SDNY when it ruled on the foreign sovereign immunity issue.

### Dismissal of the First Action for Lack of Subject Matter Jurisdiction

57.     The First Action plaintiffs' inability to prove the illegality of the Ocean transactions, mainly due to their failure to obtain discovery from FSS, resulted in the award by this Court of summary judgment in favor of Hankook on all claims on October 13, 2006.

58.     The First Action plaintiffs appealed from this Court's granting of Hankook's summary judgment motion. The Sixth Circuit Court, *sua sponte*, raised the question of subject matter jurisdiction, and on December 13, 2007, reversed the judgment of this Court and remanded the case for consideration of the need to dismiss for lack of subject matter jurisdiction. Peninsula Asset Management (Cayman) Ltd. v. Hankook Tire Co., 509 F.3d 271 (6th Cir. 2007). The Sixth Circuit Court held that: although Peninsula had its principal place of business in the United States, "[i]t is well established that, under § 1332(a)(2), even if a corporation organized under the laws of a foreign nation maintains its principal place of business in a State, and is considered a citizen of that State, diversity is nonetheless defeated if another alien party is present on the other side of the litigation." Id. (citation and internal quotation marks omitted).

59.     Upon remand from the Sixth Circuit Court, agreeing with the Sixth Circuit Court on the jurisdictional defect, this Court dismissed the First Action without prejudice for lack of subject matter jurisdiction on February 1, 2008. A

correct copy of this Court's February 1, 2008, Memorandum Opinion and Order is attached hereto as **Exhibit G**.

60. Following this Court's decision to dismiss the First Action without prejudice in February 2008, upon information and belief, Hankook decided to dissolve Ocean in an effort to escape liability to Plaintiff and to conceal any unlawful transactions involving Ocean, and completed the liquidation of Ocean in May 2009 by transferring all of Ocean's assets to itself.

## Change in the Legal Status of FSS in South Korea in 2009

61. Unlike the unified organizational structure in most countries, including the United States, the financial supervisory organization in South Korea consists of both public-sector organizations such as FSC and SFC, and civil-sector organizations such as FSS. Indeed, one of the directives of the Establishment Act which created FSS and FSC (and SFC) is not to infringe on the autonomy of financial institutions. Section 2 of the Establishment Act.

62. In an apparent effort to clarify such directive of the Establishment Act, on January 29, 2009, during the first meeting of the Management Committee for Public Institutions, the South Korean government, acting through MOFAE, announced its decision to release FSS from the designation of "public institution" to secure autonomy and independence of FSS and financial institutions from the government. Thus, this policy decision transformed FSS from a civil public corporation, which might have caused some confusion about the legal status of FSS,

23

into a pure civil corporation that maintains complete independence from the government or its agencies. Without more, this decision by the South Korean government leaves no room for any doubt that FSS, is not a government organ of South Korea.

63.     Previously in 2008, in line with the same policy considerations addressed above, the South Korean government separated the governorship of FSS from the previous concurrent holding of head offices of both FSC and FSS.

### Re-Institution of Plaintiff's Cause of Action Against Hankook and Mr. Cho

64.     Since the designation of FSS as a "public institution" was revoked in 2009, Han and Park have continuously urged FSS and other relevant South Korean authorities such as MOFAT and FSC to rectify FSS's legal status as a government organ of South Korea so that they can resume their action against Hankook and Mr. Cho. However, none have complied with these legitimate requests without any valid excuse for their refusal. Indeed, such refusal was because of subtle, yet unmistakable political reasons—Myungbak Lee ("MB Lee"), the father-in-law of Mr. Cho's son, became the president of South Korea in 2008, and soon after, Yoon was also appointed as the Minister of MOFAE. This situation adversely or at least considerably hindered, Plaintiff's efforts to seek remedies in this matter throughout MB Lee's five (5) year tenure as president of South Korea.

65.     Gyun-hye Park ("GH Park") became South Korea's first female leader when she was elected president on December 20, 2012. Hoping that under the new

administration, no improper political influence would be wielded to obstruct their pursuit of claims against Hankook and Mr. Cho, on or about February 18, 2013, Park, for himself and on behalf of Han, filed a formal civil petition (the "Petition") with the Consulate General of South Korea in New York (the "Consulate"), requesting that the Consulate send a letter informing the SDNY or Department of State of the United States that FSS is not a government organ of South Korea. However, the Consulate referred the Petition to the MOFAT headquarters in Seoul, South Korea.

66.     Thereafter, in March 2013, MOFAT transferred the Petition to FSC, explaining to Park that whether the statement regarding the legal status of FSS—that was delivered to the SDNY and Department of State of the United States—was untrue or not, Yoon, or any other FSC or MOFAE officials, not MOFAT, should be responsible for any wrongdoings, if any.

67.     Upon receipt of the Petition transferred from MOFAT, in April 2013, FSC sent the Petition back to MOFAT along with a note that merely referred MOFAT to certain provisions of the Establishment Act. Thus, in fact, FSC declined to confirm to MOFAT that FSS is a government organ of South Korea. This is simply because FSS is a pure civil corporation, not a government organ.

68.     Dissatisfied by the FSC's refusal to ascertain that FSS is a government organ as it did in 2005, in May of 2013, MOFAT again sent the Petition back to FSC. This extreme pattern of evasion of responsibility by MOFAT and FSC has continued until the early part of 2017.

69.    On December 9, 2016, President GH Park was impeached by the South Korean National Assembly over a corruption scandal involving bribery, extortion and abuse of power in connection with allegations of conspiring with her childhood friend to collect tens of millions of dollars in bribes from the *chaebol*, South Korea's family-run conglomerates such as Samsung. On March 10, 2017, the Constitutional Court of South Korea upheld the impeachment in a unanimous 8–0 decision, removing GH Park from office, cutting short her five-year term by 11 months. Upon GH Park's removal from office, a new presidential election was held on May 9, 2017.

70.    Given that the expiration of the Ohio statute of limitations applicable to breach of contract (fifteen years from accrual of cause of action for breach of contract in writing, *see* 129th Ohio General Assembly File No. 135, SB 224, §4) was fast approaching, and in the hope that the new South Korean government would not allow collusive links between politics or government-sector and the *chaebol* such as Hankook to continue to exist in South Korea, on June 9, 2017, Han earnestly filed the New York Action to obtain discovery from FSS in order to resume her cause of action against Hankook and Mr. Cho.

### COUNT ONE—Breach of Contract

74.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

75.    As described herein and as the evidence will further establish, Defendant entered into a binding contract and agreement with Plaintiff.

76.    Han and Peninsula performed their contractual obligations under the

Case: 5:17-cv-02046-SL  Doc #: 1  Filed: 09/29/17  27 of 31.  PageID #: 27

relevant contract and agreement, and all other conditions precedent have been performed or have occurred.

77.     Defendant failed to fulfill its contractual obligations, without any legal excuse. The breaches include, but are not limited to Defendant's failure to honor its indemnity obligations under the Placing Agreement.

78.     Defendant was the signatory that as principal, signed the Placing Agreement containing the Indemnity Clause. Defendant was the party to the contract negotiations between Plaintiff and Ocean.

79.     Plaintiff reasonably believed that Defendant was the acting party to the Placing Agreement and justifiably relied upon that belief in performing under the agreement.

80.     Defendant refused to honor the Indemnity Clause.

81.     As a consequence, Defendant is equitably estopped to deny the existence and validity of the indemnity agreement with Plaintiff. The essential elements of equitable estoppel are present in this case.

82.     Plaintiff suffered damages as a result of the breaches by Defendant of the Indemnity Clause.

<u>**COUNT TWO—Piercing the Corporate Veil**</u>

83.     Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

84.     As with many paper companies in tax haven areas that are formed with no capital and no employees, Ocean had been until its dissolution and liquidation by Defendant, merely an account name holding assets by its name in a custodian bank—

27

and at the time of execution of the Placing Agreement, Ocean was just the name of a company which existed only on paper. Upon information and belief, Ocean had nominal capital of $0.01 and did not issue any shares except for one incorporation share, left on trust with a local trust company in Labuan, Malaysia.

85.     Ocean was a sham and device with no meaningful substance created by Defendant and Mr. Cho as a mere tool and conduit for Hankook and Mr. Cho to perpetrate unlawful acts and hold assets unlawfully formed in a tax haven area.

### COUNT THREE—Successor Liability

86.     Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

87.     At the time of the dissolution and liquidation of Ocean, Defendant knew, or should have known, that Plaintiff's claims against Defendant and Mr. Cho were not extinguished.

88.     Nonetheless, Defendant dissolved and liquidated Ocean by sending all of Ocean's assets to itself.

89.     Upon information and belief, Defendant dissolved and liquidated Ocean in an attempt to escape liability to Plaintiff and to conceal unlawful transactions involving Ocean. By liquidating Ocean and transferring all of Ocean's assets to itself, Defendant impliedly agreed to assume liability of Ocean to Plaintiff.

90.     Under the doctrine of successor liability, Defendant, as successor to Ocean, is liable to Plaintiff for the damages suffered by Plaintiff as a result of the breaches of the Indemnity Clause.

### COUNT FOUR—Fraud and Fraudulent Inducement

91.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

92.    As described herein and as the evidence will further establish that in connection with the Ocean transactions, Defendant made representations to Plaintiff and concealed facts it had a duty to disclose.

93.    The representations and omitted facts were material to the transactions at hand, and the representations were made falsely, or with such utter disregard and recklessness as to whether they were true or false that knowledge may be inferred.

94.    Defendant made the false representations with the intent of misleading Plaintiff into relying on it, and Plaintiff's reliance on the representations and omissions was justifiable. Defendant intended to induce Plaintiff's reliance on its representations so that Plaintiff would agree to provide certain financial services in connection with the Ocean transactions.

95.    The limitations period applicable to Plaintiff's fraud-related claim has run. However, as described herein and as the evidence will further establish, since the First Action was dismissed without prejudice in 2008, while Plaintiff has been pursuing her rights diligently, FSS, acting in concert with Defendant, has not only fraudulently concealed and obstructed the discovery of Plaintiff's cause of action against Defendant, but also unlawfully or improperly hampered proof of Plaintiff's case by refusing to provide evidence without any valid grounds. Thus, in light of the extraordinary circumstances and Plaintiff's diligence, Plaintiff is entitled to invoke equitable tolling to save her fraud-related claim against Defendant.

96. Plaintiff suffered resulting injuries which were directly and proximately caused by her justifiable reliance on Defendant's material misrepresentations and omissions.

WHEREFORE, Plaintiff prays for relief as follows:

A. Judgment awarding compensatory damages in favor of Plaintiff and against Defendant in an amount, which exceeds $75,000.00, to be determined at trial (All Counts);

B. Judgment awarding punitive damages against Defendant in an amount to be determined at trial (Count Four);

C. Awarding the costs and attorneys' fees incurred in the commencement and prosecution of this action; and

D. Any other and further relief which the Court may deem just and proper.

## RESERVATION OF RIGHTS

Plaintiff reserves her right to amend this original Complaint to assert any additional claims for relief against Defendant or other parties as may be warranted under the circumstances and as allowed by law.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

RESPECTFULLY SUBMITTED this _28th_ day of September, 2017.

HO LAW GROUP, PLC

Daniel S. Ho, Esq.
Arizona State Bar No. 025311
(*pro hac vice* motion pending)
11811 North Tatum Blvd., Suite 2900
Phoenix, Arizona 85028
Phone: (602) 354-7346
Fax: (602) 354-7469
daniel@holawplc.com

*Attorney for Plaintiff*